IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NICHOLAS FRITSCH,

                             Plaintiff,

  v.                                              OPINION and ORDER

JOE RIES,                                         23-cv-803-jdp

                             Defendant.

---

Plaintiff Nicholas Fritsch, proceeding without counsel, alleges that defendant Officer Joe Ries disregarded the risk that he would cut himself while incarcerated at the Portage County Jail, which he ultimately did. Fritsch proceeds on a Fourteenth Amendment conditions-of-confinement claim.

Ries moves for summary judgment. Dkt. 58. A reasonable officer would have a basis to think that Fritsch was unlikely to harm himself and was behaving disruptively to manipulate staff. And some efforts had been made to mitigate the risk that Fritsch would harm himself, including placement in a single-occupancy holding cell, in-cell camera monitoring, and periodic cell checks. Fritsch hasn't identified any controlling case establishing that an officer's failure to take greater measures in similar circumstances to protect a prisoner from non-suicidal self-harm was objectively unreasonable. So Ries is entitled to qualified immunity. I will grant the motion and close the case.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

Fritsch entered the Portage County Jail on September 7, 2023, as a pretrial detainee. Defendant Ries worked at the jail as a correctional officer.

On September 25, 2023, multiple prisoners asked for Fritsch to be moved to another area of the jail, reporting that he was causing problems. Fritsch was moved to a single-occupancy cell. Fritsch said that he was having a mental health emergency and was thinking about "going on a watch." Officer Bettcher asked Fritsch if he was suicidal or had any plans to kill himself, to which he responded, "Did I say that?"

The next day, Fritsch said that he was suicidal and asked to be moved to a holding cell. Fritsch told Officer Schmidt that he was not going to hurt himself but needed to be alone. Fritch was moved to Holding Cell 3. Later that night, Fritsch urinated and defecated in his cell and used feces to obscure his cell's view port and the lens on the in-cell monitoring camera. Fritsch had previously engaged in similar behavior at the jail.

On October 7, 2023, Fritsch said that he was struggling with his mental health and needed to be alone, after which he was moved to a holding cell. That evening, Fritsch smeared feces on his cell's camera. The next afternoon, Fritsch urinated through the food trap and a crack in the door multiple times, covered his camera with feces two times, and tried to flood his cell. Later that afternoon, Fritsch cut his forearm and was transported to the hospital for stitches. He was closely monitored when he returned from the hospital until his transfer to Winnebago Mental Health Institution on October 10, 2023.

Fritsch returned to the jail on October 18, 2023, and he was placed in Holding Cell 3, which has single occupancy. Fritsch said that he didn't feel suicidal, and he received a score of

2

zero on his suicide assessment. Fritsch also received a general risk assessment. The parties dispute whether Fritsch displayed any signs of mental distress during the assessment. But it's undisputed that an officer documented that Fritsch answered "no" to each risk assessment question, and that he received a score of zero. Dkt. 61-13.

Between 1:30 p.m. and 2:10 p.m., Fritsch started to press the emergency intercom and shout that he needed to call his attorney. Ries wheeled the mobile phone unit in front of Fritsch's cell, but Fritsch started screaming at Ries because his pin codes did not work. Ries left, and Bettcher went to Fritsch's cell to try to calm him. Fritsch continued to scream and aggressively grabbed the handset, so Bettcher removed the handset from his cell. Fritsch then covered his camera and the cell with feces, urinated on the floor, and screamed vulgar statements.

Fritsch says that, at around 2:00 p.m., he told Ries that he was suicidal and placed a staple on the handheld phone that Ries used for cell checks. *See* Dkt. 73 ¶¶ 4, 7. Ries initially said in his answer to the complaint that Fritsch gave him a staple. Dkt. 14 at 2. But Ries clarifies in his answers to interrogatories and declaration that Fritsch did not say anything to indicate that he was at risk of harming himself or show him any items that he could use for that purpose. Dkt. 62 ¶¶ 9–10; Dkt. 65-3 at 1. Hallway surveillance video contradicts the statement that Fritsch gave Ries a staple, whether by putting it on his handheld phone or otherwise, during any of their interactions that could have occurred between 1:30 p.m. and 2:38 p.m. *See* Dkt. 83, Ex. Q (2:46:24–44, 2:47:26–28, 3:06:43–3:10:52, 3:06:43–3:10:52, 3:17:55–3:18:05, 3:28:28–3:29:42).

Around 2:38 p.m., Ries tried to get Fritsch to change into a security garment commonly called a suicide smock. A suicide smock is an article of clothing that cannot be tied into a noose

and that prevents prisoners from destroying jail uniforms or using them to clog toilets or cover cameras. *See* Dkt. 80 ¶ 82. Ries says that he brought the smock because Fritsch had covered his clothes in feces. Fritsch disputes that he had covered his clothes in feces, and he says that Ries brought the smock because he was suicidal.

Fritsch refused to wear the smock and made vulgar remarks. Ries left the smock in Fritsch's cell for him to change into. Ries says that he did not force Fritsch into the smock because he was concerned about officer safety and sanitary issues related to feces. Dkt. 62 ¶ 7.

Fritsch was removed from Holding Cell 3 from 4:00 p.m. to 5:00 p.m. for a probation revocation hearing, and his probation was revoked. When Fritsch returned to that cell, he asked Bettcher if staff could "reset this food thing," which meant that he wanted an extra meal. *See* Dkt. 61-14 at 2; Dkt. 61-15 at 1; Dkt. 80 ¶ 93. Bettcher asked kitchen staff if that was possible, and he was informed that double portions were no longer available. Bettcher relayed that information Fritsch, who later ate his entire meal tray. Dkt. 61, Ex. P (2:04:46–2:11:02).

After eating, between 5:10 and 5:20 p.m., Fritsch twice covered his camera with toilet paper, which Ries and other officers removed. Fritsch then covered himself with a blanket and eventually sat down on his bed, facing away from the camera. At about 5:33 p.m., Ries noticed that Fritsch had removed his blanket and that blood covered his camera. Ries immediately radioed to other officers that Fritsch appeared to be cutting himself.

Officers went to Fritsch's cell. Ries says that the officers noticed that Fritsch had reaggravated a previous wound on his right forearm by digging into it with his fingers, but Fritsch says that it was a fresh cut. Dkt. 80 ¶ 100. Fritsch says that he made the cut with a staple that he removed from a religious pamphlet that was in his cell. While Bettcher spoke with Fritsch through the door, Ries and other officers went to get gauze and medical tape. Ries

and the officers then entered Fritsch's cell and secured his arm to stop the bleeding. An ambulance was called and Fritsch was transported to the hospital for treatment for his injuries.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Fritsch was a pretrial detainee when the events at issue occurred, so the Fourteenth Amendment governs his challenge to his conditions of confinement. *Pittman by & through Hamilton v. Madison Cnty., Ill.*, 108 F.4th 561, 566 (7th Cir. 2024).

Fritsch seeks relief against Ries based on the theory that he disregarded the risk that Fritsch would cut himself with a staple. Fritsch says that even though he told Ries that he was suicidal and gave him a staple, Ries threw a suicide smock in his cell and left without making him wear it or taking any other action to stop him from cutting himself, such as removing his property from the cell or putting him on suicide watch.

Under the Fourteenth Amendment, Fritsch must establish that: (1) Ries engaged in intentional conduct or made an intentional decision about the conditions of his confinement; and (2) Ries's conduct or decision was objectively unreasonable in the circumstances. *Est. of Sillah by Carter v. City of Madison*, No. 23-cv-96-jdp, 2024 WL 4650945, at *9 (W.D. Wis. Nov. 1, 2024). The first element "requires proof only that [Ries] made an intentional decision about [Fritsch's] conditions." *Id.* If Fritsch proves that Ries "acted intentionally, then the analysis moves on to whether a reasonable officer under the circumstances would have engaged in that conduct or made that decision." *Id.* I will assume for purposes of this opinion that Ries made an intentional decision about Fritch's conditions of confinement. The basic issue is whether Ries's conduct was objectively reasonable.

5

But there is another layer. Qualified immunity shields state actors from liability where their conduct does not violate clearly established constitutional rights. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620 (7th Cir. 2022). In resolving questions of qualified immunity at summary judgment, courts ask: (1) whether the facts, when taken in the light most favorable to the plaintiff, show that the defendant violated a federal right; and (2) whether the right was clearly established at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). I need not consider the first element if the right wasn't clearly established at the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). I'll take that approach here even though Ries has made a strong showing that his conduct was objectively reasonable.

"A right is clearly established where it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Stockton*, 44 F.4th at 620. In most cases, the plaintiff must identify a closely analogous controlling case finding the alleged violation unlawful, or at least a clear trend in persuasive authority showing that "recognition of the right by a controlling precedent was merely a question of time." *Id.*; *accord Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). Fritsch bears the burden of defeating Ries's claim to qualified immunity. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021).

A reasonable officer would have reason to think that Fritsch was unlikely to harm himself. After Fritsch cut his forearm on October 7, 2023, he received treatment at a mental health hospital and was discharged. That would indicate that Fritsch had been stabilized. Fritsch says that his hospitalization supports a contrary inference, namely, that he had serious mental health problems. But Fritsch received scores of zero on his suicide and general risk assessments when he returned to the jail. Fritsch says that he displayed signs of mental distress

6

during the general risk assessment, but Ries did not administer the assessment and it doesn't document any distress. Even if Fritsch was mentally ill, there was a strong basis to think that he didn't pose a risk of self-harm when he returned to the jail.

The parties dispute whether Fritsch told Ries that he was suicidal. Fritsch says that he told Ries that he was suicidal several times. *See* Dkt. 65 at 4 ("I was yelling . . . for some time . . . [that] I was suicidal."); *see also* Dkt. 61-14 at 1 (Bettcher's report stating that Fritsch made "self-harm comments"). Even if Fritsch repeatedly said he was suicidal or otherwise threatened self-harm, there was a factual basis to doubt these statements. As this and other courts have acknowledged, prisoners sometimes use threats of self-harm to manipulate prison staff. *See, e.g.*, *King v. Rutledge*, 24-cv-503-jdp, Dkt. 7 at 2; *Shaw v. Hoffstatter*, No. 23-cv-1272, 2024 WL 4751373, at *3 (E.D. Wis. Nov. 12, 2024) ("It is becoming apparent that some prisoners are using threats of self-harm to manipulate prison staff and engineer [civil rights] claims."). Fritsch had a history of disruptive behavior at the jail, and he had previously complained about his mental health and suggested that he was at risk of harming himself without engaging in that conduct. *See also* Dkt. 62 ¶ 4 (Ries's statement that he was aware that Fritsch had a history of "using erratic behaviors . . . to manipulate correctional staff"). Prison staff documented, and Fritsch hasn't directly disputed, that he admitted shortly after the incident that no officer thought he was suicidal. Dkt. 61-15 at 1.

Fritsch says that he handed Ries a staple, arguing that Ries must have realized from that behavior that he was at an elevated risk of self-harm. Fritsch notes that Ries initially stated in his answer that he gave him a staple, and he accuses him of providing perjured testimony. But the evidence shows that Ries was mistaken when he provided that answer. Fritsch did not provide a date for the incident at issue in the complaint, and there was an incident two days

7

later (October 20, 2023) in which Ries and other officers went to his cell and asked him to hand over a staple. *See* Dkt. 83-2 at 1. Fritsch's statement that he gave Ries a staple during the incident on October 18, 2023, is contradicted the by video evidence, and I must accept facts shown in the video as undisputed. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Fritsch notes that Ries gave him a suicide smock, and he argues that this fact shows that Ries thought that he would harm himself. Giving a prisoner a smock alone does not show that an officer thinks that he is likely to cut himself or reaggravate a prior wound. It's undisputed that smocks serve a variety of purposes, and that they are not intended to prevent all forms of self-harm or to be used like a straitjacket. *See* Dkt. 80 ¶¶ 82, 84. Fritsch disputes that he covered his clothes with feces after Bettcher took the handset, but it's undisputed that he covered his cell and the camera with feces after that encounter. It was reasonable to think that Fritsch's clothes were soiled. Fritsch faults Ries for failing to make him wear the smock. But Fritsch had recently spread feces in his cell and behaved aggressively toward officers, and he refused to wear that garment. In the circumstances, it was reasonable to conclude that forcing Fritsch into the smock would have escalated the situation and threatened officer safety. *Cf. Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020) (en banc) (courts must defer to prison officials' adoption of practices that they believe are needed to preserve internal order and security). Nor is there any evidence that using the smock would have stopped Fritsch from cutting himself or reaggravating his prior wound. Fritsch hasn't explained how wearing a smock would have stopped that outcome.

Even though Ries did not force Fritsch into the smock, Fritsch refrained from harming himself for about three hours. In that time, Bettcher informed Fritsch that he could not have double food portions. After eating his entire tray, Fritsch continued to behave disruptively by

8

covering his camera with toilet paper. These facts further suggest that Fritsch's act of self-harm was intended to manipulate prison staff, or at least to protest perceived mistreatment. Fritsch acknowledges that he was angry at prison staff because they interfered with his call to his attorney, pointed a Taser at him, and denied him extra food. *See* Dkt. 65 at 3, 5–6.

If Fritsch is arguing that no efforts were made to stop him from harming himself, the undisputed evidence shows otherwise. When he harmed himself, Fritsch was in a single-occupancy holding cell that had an in-cell camera, and the officers made periodic cell checks. Officers removed toilet paper and feces from the in-cell camera. After Fritsch removed the blanket and spread blood in his cell, Ries immediately notified other officers that he appeared to be cutting himself, and he received prompt medical attention. Fritsch faults Ries for failing to remove the religious pamphlet that he says he took a staple from to cut himself. But Fritsch admits that he didn't realize a staple was in the pamphlet for hours. *See* Dkt. 65 at 4–5 ("I didn't see the second one because it was torn [through] the cover and was underneath it. . . . [A]t 2:00 p.m. I didn't even know it was there."). Apart from the arguments I've rejected, Fritsch hasn't explained how a reasonable officer would have realized that the pamphlet had a staple, let alone realized that he would use its contents to cut himself. As a whole, the evidence compels the finding that Ries reasonably responded to a difficult problem of prison administration.

Fritsch says that Ries's claim of qualified immunity should be denied based on *Hall v. Ryan*, 957 F.2d 402 (7th Cir. 1992). Dkt. 65 at 9–10; Dkt. 74. *Hall* denied the defendants' claim of qualified immunity in a case in which a pretrial detainee hanged himself by his underwear, leaving him in a permanent comatose state. 957 F.2d 402–03. *Hall* is distinguishable. In holding that the defendants' knowledge of the detainee's "suicidal

9

tendencies" was genuinely in dispute, the court stressed that the detainee had a documented history of several suicide attempts. *See id.* at 405–06. There is no evidence that Fritsch had a documented history of several suicide attempts, let alone that Ries thought that to be the case. The only evidence is that before the underlying incident, Fritsch had engaged in non-suicidal self-harm once. Fritsch suggests in his brief in opposition that there were other instances of non-suicidal self-harm, but I will not treat those unsworn statements as evidence. *See Stanford v. Wenzel*, No. 23-cv-604-jdp, 2024 WL 4039801, at *2 (W.D. Wis. Sept. 4, 2024); *see also* Dkt. 17 at 8. Even if there were other instances of non-suicidal self-harm, there's no evidence that Ries knew about any of them.

The evidence compels the finding that Ries's response to Fritsch's conduct was objectively reasonable in the circumstances, and Fritsch hasn't identified a controlling case establishing otherwise. I will grant summary judgment to Ries on qualified immunity grounds.

ORDER

IT IS ORDERED that:

1. Defendant Joe Ries's motion for summary judgment, Dkt. 58, is GRANTED.

2. The defendant is to be recaptioned under the name "Joe Ries."

3. Defendant's motion to amend pretrial conference order, Dkt. 93, is DENIED as moot.

4. The clerk of court is directed to enter judgment and close the case.

Entered June 16, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge